In re Arthur Joseph **DEEREY, Jr.,** Debtor.

**DirecTV, INC., Plaintiff,**

v.

**Arthur Joseph Deerey, Jr., Defendants.**

**Bankruptcy No. 9:05–bk–06995–ALP.**
**Adversary No. 9:05–ap–00548–ALP.**

United States Bankruptcy Court,
M.D. Florida,
Fort Myers Division.

Jan. 25, 2007.

See also 344 B.R. 159.

Benjamin C. Iseman, Douglas C. Spears, J. Richard Young, III, Stump Callahan Dietrich & Spears PA, Orlando, FL, Edwin G. Rice, Glenn Rasmussen Fogarty & Hooker PA, Tampa, FL, John H. Jamnback, Michael Rosenberger, Scott T. Wilsdon, Yarmuth Wilsdon Calfo PLLC, Seattle, WA, for Plaintiff.

Richard Johnston, Jr., Kiesel Hughes & Johnston, Fort Myers, FL, for Defendants.

### FINDINGS OF FACT, CONCLUSION OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Bankruptcy Judge.

THE MATTER under consideration in this Chapter 7 liquidation case of Arthur Joseph Deerey, Jr. (Debtor) in the above-captioned Adversary Proceeding is a multiple-count First Amended Complaint filed by DirecTV, Inc. (DIRECTV) against the Debtor.

In the Complaint, DIRECTV alleges in Counts IA and IB that a certain debt owed to DIRECTV, Inc. by the Debtor is non-dischargeable pursuant to Sections 523(a)(6) and 523(a)(4) of the Bankruptcy Code. The Claim in Count II is based on the contention that the Debtor committed a fraudulent transfer in violation of Florida Statutes § 726.105. DIRECTV further alleges in Count III of its Complaint that they have an equitable lien and/or constructive trust in the funds the Debtor used to purchase certain real property, and the stated equitable lien and/or constructive trust in favor of DIRECTV is to the exclusion of any and all other creditors. In Count IV, DIRECTV also alleges that the Debtor committed a fraudulent transfer in violation of Florida Statutes § 726.105. In Count V of the Complaint,

DIRECTV alleges that they have an equitable lien and/or constructive trust in the funds used by the Debtor to finance the Debtor's IRAs and his company's Employee Stock Ownership Plan (ESOP), and that the equitable lien and/or constructive trust is to the exclusion of any and all creditors.

In response to DIRECTV's Complaint, the Debtor contends that DIRECTV cannot as a matter of Florida law obtain an equitable lien or constructive trust against the Debtor's home located at 1401 King Sago Court, Naples, Florida, since DIRECTV's claim does not fall within any of the categories of the Florida Constitution which authorize a lien against homestead property. The Debtor also contends that DIRECTV's ·claim to establish an equitable lien or constructive trust upon the Debtor's Home and ESOP are time barred pursuant to the applicable statutes of limitation set forth in Sections 95.11(3) and 95.031(1) of the Florida Statutes.

Furthermore, the Debtor contends that the present claim of nondischargeability is based on the Debtor's consent to the entry of a Consent Judgment, which provided for an injunction and a monetary judgment in the amount of $500 million pursuant to 47 U.S.C. § 605(e). The Debtor, while he does not dispute his liability to DIRECTV under the Consent Judgment, contends that there were no findings made in the District Court that support DIRECTV's claims of nondischargeability under Section 523(a)(4) or 523(a)(6) of the Code.

Judgment was granted in favor of the Debtor on Counts II and IV of the Complaint on March 2, 2006. (Doc. Nos. 56, 57). Prior to the conclusion of this matter, DIRECTV chose not to pursue its claims against the funds in Debtor's IRA, and an Order granting Judgment in Part to the Debtor on Count V of the Complaint was entered December 11, 2006. (Doc. No. 120).

On July 19, 2006, at the duly scheduled and noticed final evidentiary hearing on the Complaint, this Court heard argument of counsel for DIRECTV and for the Debtor. In addition, this Court has considered the record, including testimony of witnesses and all documentary evidence offered and admitted into evidence and now makes the following findings and conclusions based on the record.

## BACKGROUND

Prior to the commencement of this Chapter 7 case of the Debtor, DIRECTV filed suit in the United States District Court, District of California against various defendants. On July 3, 2001, DIRECTV filed its Second Amended Complaint for Compensatory, Statutory and Other Damages, and for Injunctive Relief in the District Court of California, case number CV 01–370DOC(ANx), *DirecTV, Inc. v. Derek E. Trone d/b/a Whiteviper Technologies; Art Deerey; TDBAM, Inc. et al.* (California Litigation). The Second Amended Complaint added the Debtor as a defendant to an existing lawsuit against manufacturers and distributors of satellite signal theft devices. The case was transferred to the Central District of California, and the case number assigned to the transferred case changed to CV 02–5194PA(RCx).

DIRECTV's Second Amended Complaint against the Debtor in the Central District of California included claims for Compensatory, Statutory and other Damages, and for Injunctive Relief for violations of: the Communications Act of 1934, as amended, 47 U.S.C. § 605; the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201–1205; the Electronic Communication Privacy Act (Federal Wiretap Laws), 18 U.S.C. §§ 2510–2521; California Penal Code §§ 593d and 593e, California Civil Code §§ 3426–3426.11 (Trade Secret Act);

California Business and Professional Code §§ 17200 et seq.; and California common law. (Second Amended Complaint).[1]

In the California litigation, the Central District of California Court granted DIRECTV's Motion for Partial Summary Judgment against the Debtor and others based on the Civil Minutes in which the Central District of California Court made certain findings.[2] In addition to granting the Money Judgment to DIRECTV, the Central District of California Court also granted a Permanent Injunction against the Debtor.

On April 13, 2005, the Debtor filed his voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. DIRECTV filed its original Complaint in the above-captioned Adversary Proceeding on July 18, 2005, setting forth five (5) separate claims. On November 7, 2005, DIRECTV filed a Motion for Summary Judgment as to Count I of Adversary Complaint (Doc. No. 20). On the same date, the Debtor filed a Motion for Summary Judgment on all Counts of the Adversary Complaint (Doc. No. 23). On December 22, 2005, this Court entered its Order denying DIRECTV's Motion for Summary Judgment as to Count I of the Adversary Complaint and also denied Defendant's Motion for Summary Judgment (Doc. No. 30). On March 2, 2006, this Court entered its Orders Granting Judgment in Favor of the Debtor as to Counts II and IV of the original Complaint on the grounds that the Plaintiff lacked standing to pursue those claims (Doc. Nos. 56 and 57).

On April 24, 2006, DIRECTV filed its Motion for Leave to File First Amended Complaint (Doc. No. 75). On June 6, 2006, this Court entered its Order Granting DIRECTV's Motion to Amend Complaint and First Amended Complaint Attached to the Motion is Deemed Filed. (Doc. No. 84). The First Amended Compliant embellishes the original Complaint filed by DIRECTV, in that, it includes a new theory that the Debtor's actions in violation of the Communication Act which resulted in the Judgment in the amount of $500 million against the Debtor constituted larceny of the Plaintiff's proprietary broadcast. Therefore, it is DIRECTV's contention that the debt arising from the Debtor's violation of the Communication Act is excepted from discharge pursuant to Section 523(a)(4) of the Bankruptcy Code.

On June 16, 2006, the Defendant timely filed his Answer and Affirmative Defenses to First Amended Complaint. (Doc. No. 88). On the same date, DIRECTV filed its Partial Motion for Summary Judgment and to Except Debt from Discharge on Count IA and Count IB of the First Amended Complaint. (Doc. No. 89). On July 6, 2006, the Debtor filed his Motion for Summary Judgment on Count IA, Count IB, Count III, and Count V of the First Amended Complaint. (Doc. No. 98). On July 13, 2006, this Court entered its Order denying DIRECTV, Inc.'s Motion for Partial Summary Judgment and also denied the Defendant's Motion for Summary Judgment. (Doc. No. 101). In addition to denying both Motions, this Court scheduled a Final Evidentiary Hearing on the First Amended Complaint on Counts IA, IB, III and V for July 19, 2006.

The facts upon which the First Amended Complaint is based appear from the record and are as follows:

1. Second Amended Complaint for Compensatory, Statutory and other damages, and for Injunctive Relief, No. SA CV 01–370 DOC (ANx).

2. Plaintiff's Exhibit "B" of Amended Complaint, United States District Court Central District of California, Civil Minutes—General, Case No.: CV 02–05194 PA (RCx), February 10, 2003, Page 4 of 4.

DIRECTV is a nationwide provider of direct broadcast satellite programming, including movie channels, sports, major cable networks, and local channels. DIRECTV contracts and pays for the right to distribute the programming to the subscribers, and holds license rights under the Copyright Act. DIRECTV offers various subscription packages to their customers. In addition to the subscription packages, DIRECTV also offers pay-per-view to their monthly subscribers. To guard against unauthorized access, DIRECTV encrypts, that is, electronically scrambles its satellite transmissions through the use of equipment and technology specifically designed for DIRECTV by News Datacom Limited, NDS Americas, Inc., and NDS Limited (NDS). In addition to the above, NDS also developed various Access Cards which authorize subscribers to view its selected television programming in a decrypted, that is, descrambled format, once the Access Card is activated by DIRECTV.

A standard DIRECTV package consists of a small satellite dish (Dish), DIRECTV integrated receiver/decoder (IRD), and a DIRECTV Access Card, also known as a "smart card." The Dish connects to the IRD, which in turn connects to the subscriber's television. The Access Card is inserted into the IRD, and allows the IRD to process the incoming signals. Essentially, the Access Card acts as a reprogrammable "key" that allows the IRD to decrypt the programming purchased by the subscriber, while at the same time capturing and transmitting information from the subscriber back to DIRECTV. The Access Card, being the key component necessary to unlock the encryption of DIRECTV's satellite programming, is the crux of the company's security and billing system.

DIRECTV began broadcasting sometime in June of 1994. The following year, in November of 1995 DIRECTV discovered that their first generation Access Card, the Period 1 card, had been compromised. Technology had been developed by the satellite piracy community to reprogram the computer chip that resides under the gold seal of the first generation Access Card to allow the card to unscramble all of DIRECTV's television subscription services as well as its pay-per-view services. Furthermore, the technology developed by the satellite piracy community allowed users to receive the satellite transmissions provided by DIRECTV without paying DIRECTV any fees. Based on the Period 1 card being hacked by the satellite piracy community, DIRECTV then developed a second generation, the "H" or Period 2 Access Card.

Sometime in December 1996, DIRECTV began to send the Period 2 cards to their subscribers to replace the Period 1 card that had been compromised in 1995. During August 1997 DIRECTV discovered that the satellite piracy community had also compromised the Period 2 Access Card. As a result of the Period 2 card being compromised in 1997, DIRECTV developed a third generation card, the "H2" or Period 3 card. Regardless of DIRECTV's efforts to eliminate the possibility of piracy, in November of 2000 DIRECTV discovered that the satellite piracy community had developed the technology to also illegally reprogram the Period 3 card. Thus, DIRECTV developed the fourth generation, Period 4 or P-4 card. The Period 4 card was introduced in February 2002. In addition to the Period 4 card, DIRECTV introduced the fifth generation or D-1 card in May of 2003. Both the Period 4 card and the fifth generation cards are still operational and apparently have not been compromised by the satellite piracy community.

In order to protect their programming, DIRECTV actively worked to disrupt the satellite piracy community's ability to steal their signal by disabling the modified Access Cards. DIRECTV obtained examples of the hacked cards and other devices to study them for vulnerabilities. DIRECTV's engineers would then write code designed to deactivate the cards and launch it into the data stream. These codes, referred to as Electronic Countermeasures (ECMs), were launched periodically beginning in late 1995. On Sunday, January 21, 2001, DIRECTV launched an extensive ECM to deactivate all of the modified Period 2 cards that were in existence at that time. The satellite piracy community referred to this particular attack by DIRECTV as "Black Sunday."

After DIRECTV launched their ECM on January 21, 2002, there was a significant increase in the number of internet websites advertising pirate hardware devices to overcome the drastic effects of Black Sunday. A Bootloader is one such device. Its sole purpose is to overcome the effects of the ECM on a modified Access Card by interrupting its power supply at a key interval during the card's boot cycle. This causes the card to skip over the code implanted by the ECM, allowing the disabled card to once again steal DIRECTV's signal.

As a result of the explosion of pirate hardware devices, DIRECTV's Office of Signal Integrity began to implement the civil remedy provisions set forth in the Digital Millennium Copyright Act (Pub.L. No. 105–304, 112 Stat. 2860 (1998)), 17 U.S.C. S. § 1201 et seq. (1999). In the spring of 2001, DIRECTV obtained three writs of seizure on three locations in the Los Angeles area to seize hardware devices that were in violation of the Digital Millennium Copyright Act. On May 25, 2001, DIRECTV executed one of the three writs of seizure against an establishment named Fulfillment Plus. Fulfillment Plus was a company operating out of Santa Anna, California, and was in the business of fulfilling orders for individuals selling products via the internet.

While reviewing records at Fulfillment Plus, DIRECTV determined that several customers of the company were selling devices designed to steal DIRECTV programming. Through its investigation of the records and by interviewing the owner of Fulfillment Plus, DIRECTV was able to establish that one of those customers owned a website called "dss-stuff.com." DIRECTV conducted an investigation and determined that the Debtor was the registered owner of the dss-stuff.com website.

In addition to discovering the Debtor and dss-stuff.com, DIRECTV's investigation of Fulfillment Plus led them to a manufacturer of electronic devices named American Precision, located in Wheaton, Illinois. DIRECTV obtained a writ of seizure order and raided the American Precision facilities. During its investigation of American Precision, DIRECTV was able to determine that the Debtor had hired American Precision to manufacture signal theft devices to be distributed through his website, dss-stuff.com. Based on further investigation by DIRECTV, DIRECTV raided several locations in California and Texas and determined that the Debtor was storing signal theft devices at various Fulfillment centers located in those states.

Based on the information DIRECTV obtained during its investigations, DIRECTV, on or about July 3, 2001, filed its Second Amended Complaint adding the Debtor as a defendant to an existing lawsuit against various manufacturers and distributors of satellite signal theft devices in the Central District Court of California. According to DIRECTV, the findings of the Central District Of California Court in

the Civil Minutes established all the operative elements of a viable claim under Section 523(a)(6) of the Bankruptcy Code. The nondischargeability claim of DIRECTV involves the $500 million Consent Judgment entered on May 14, 2003.[3]

## DISCUSSION OF LAW

 Bankruptcy law was designed to give "the honest but unfortunate debtor" a fresh start. *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), *Lines v. Frederick,* 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). The Bankruptcy Code excepts from discharge certain categories of debts, the repayment of which outweighs the debtor's interest in a complete fresh start. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). These exceptions to discharge are governed by 11 U.S.C. § 523.

 Because exceptions to discharge are contrary to the fresh start policy of the Bankruptcy Code, the exceptions are strictly construed against the creditor and in favor of the debtor. *In re Gans,* 75 B.R. 474, 482 (Bankr.S.D.N.Y.1987). Therefore, a creditor seeking to establish an exception to the discharge bears the burden of proof and must establish the nondischargeability by a preponderance of the evidence. *Grogan,* 498 U.S. at 286–287, 111 S.Ct. 654.

DIRECTV seeks a ruling that the Consent Judgment entered in the California litigation is a nondischargeable debt based on Section 523(a)(4) and 523(a)(6), which provide as follows:

> (a) a discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

> ...

> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

> ...

> (6) for willful and malicious injury by the debtor to another entity or the property of another ...

## WILLFUL AND MALICIOUS INJURY UNDER 11 U.S.C. § 523(a)(6)

 The Court must determine whether the debt arising from the Consent Judgment is one for a willful and malicious injury to the property of the Plaintiff. If so, the debt may not be discharged in the Debtor's Chapter 7 case. 11 U.S.C. § 523(a)(6). To prevail on a claim under Section 523(a)(6), it is not enough that an injury is caused by reckless or negligent conduct, even if the conduct was intentional, and therefore willful. *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Rather, it must be shown that the injury was both willful and malicious. *Id.*

 Courts have interpreted the term "willful" to mean an action taken deliberately and intentionally. *In re Cohen,* 121 B.R. 267 (Bankr.E.D.N.Y.1990) (citations omitted); *In re Brown,* 331 B.R. 243, 250 (Bankr.W.D.Va.2005). The requirement that an injury be "willful" can be met by showing either that the Debtor had the subjective intent to inflict the injury or that the Debtor was aware that injury was substantially certain to result from his conduct. *Carrillo v. Su (In re Su ),* 290 F.3d 1140, 1144 (9th Cir.2002)(cited by *Choice Hotels International, Inc. v. Wright (In re Wright),* 355 B.R. 192 (Bankr.C.D.Cal. 2006)).

---

**3.** Plaintiff's Exhibit "C" of Amended Complaint, United States District Court of Central District of California, Case No.: CV 02–05194 PA (Rcx), Consent to Judgment and Permanent Injunction by Defendant Art J. Deerey and TDBAM, Ltd., Page 1.

An act is "malicious" within the meaning of the discharge exception for willful and malicious injury if it is one which is wrongful and without just cause or excessive, even in the absence of personal hatred, spite, or ill will. *In re Howard,* 261 B.R. 513, 520 (Bankr.M.D.Fla.2001)(quoting *Hope v. Walker* (*In re Walker*), 48 F.3d 1161, 1165 (11th Cir.1995)). It is not necessary to show that the Debtor acted with any "ill will" toward the creditor to show malice for purposes of Section 523(a)(6). Instead, malice under Section 523(a)(6) may be implied or constructive, and may be inferred from the nature of the act. *Walker,* 48 F.3d at 1164. Implied or constructive malice may be established by showing that the Debtor deliberately and intentionally committed an act that he knew would necessarily injure a cognizable right of the creditor. *In re Jacobs,* 243 B.R. 836, 846 (Bankr.M.D.Fla.2000). The inquiry under this standard is whether the Debtor knew or should have known that his actions would cause harm to DIRECTV. *See Cohen,* 121 B.R. at 271.

The Debtor is charged with the knowledge of the natural consequences of his actions. *Cohen,* 121 B.R. at 271. *See Su,* 290 F.3d at 1146 ("In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action."). The Debtor was fully informed of the illegality of signal piracy, as evidenced by prominent disclaimers on his website, and yet he continued to deal in hardware and software that made the crime possible, motivated by the desire to profit at the expense of DIRECTV. The Debtor was also aware that the only use for his products was to enable theft of DIRECTV's programming, the natural consequence of which is the loss of subscription fees from end users. Thus, the Debtor's conduct was malicious in that it was wrongful, done intentionally, necessarily caused injury to DIRECTV, and was done without just cause or excuse.

Accordingly, this Court finds the Debtor, by manufacturing and selling signal piracy devices and by his personal use of the devices, willfully and maliciously injured DIRECTV and therefore, pursuant to 11 U.S.C. § 523(a)(6), the debt may not be discharged in bankruptcy.

### LARCENY UNDER 11 U.S.C. § 523(a)(4)

When making a determination of whether to except a debt from discharge as one resulting from a debtor's "larceny," a bankruptcy court looks to the federal common law definition of larceny, rather than state law. *In re Langworthy,* 121 B.R. 903, 907–08 (Bankr.M.D.Fla.1990); *In re Lynch,* 315 B.R. 173, 179 (Bankr.D.Colo. 2004); *In re Brown,* 331 B.R. 243, 249 (Bankr.E.D.Va.2005). Accordingly, larceny is defined as the "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." *Langworthy,* 121 B.R. at 907–08.

To shoehorn all of the Debtor's wrongful conduct that led to entry of the Consent Judgment into the definition of larceny would require this Court to make unsupportable assumptions based on unprovable probabilities, and would result in an interpretation expanding the common law definition of larceny beyond all recognition. It would be far more reasonable to base a claim of larceny instead on the Debtor's own signal piracy. There was credible testimony and circumstantial evidence presented that the Debtor had several signal theft devices at his residence that were undoubtedly used to intercept DIRECTV signals.

A similar case in which a debt was excepted from discharge on the basis of larceny is *DirecTV v. Karpinsky,* 328 B.R. 516 (Bankr.E.D.Mich.2005). In that case, the court found that the debtor had purchased and resold four signal theft devices and had three other devices in his possession which were used to pirate DIRECTV's signal. The court ruled that the Debtor's intentional misappropriation of DIRECTV's satellite signals constituted larceny under Section 523(a)(4) and a willful and malicious injury under Section 523(a)(6) of the Code. *Id.* at 527. The court awarded fines both for Debtor's trafficking in the devices and his own piracy, and held the entire award nondischargeable under 11 U.S.C. §§ 523(a)(4) & (a)(6). *Id.* at 528.

This Court must determine whether a debt already owed by the Debtor is one for larceny, not whether and how much the Debtor should be fined for his alleged larceny, or which Sections of 47 U.S.C. § 605 were violated. That debt arises from the Consent Judgment entered in the District Court, which is based on liability under 47 U.S.C. § 605(e)(3)(C)(i). This subsection deals with civil penalties rather than criminal violations, allowing actual or statutory damages to be awarded for signal piracy and trafficking in signal theft devices for profit. Even assuming the Debtor's individual piracy was an act of larceny, upon review of the statute it becomes clear that the statutory fines awardable for an act of piracy are only a tiny fraction of the penalties that may be imposed for each signal theft device manufactured or sold. Section 605(e)(3)(C)(i), provides that:

(C)(i) Damages awarded by any court under this section shall be computed, at the election of the aggrieved party, in accordance with either of the following subclauses;

. . .

(II) the party aggrieved may recover an award of statutory damages for each violation of subsec. (a) involved in the action in a sum of not less than $ 1,000 or more than $ 10,000, as the court considers just, and for each violation of paragraph (4) of this subsection involved in the action an aggrieved party may recover statutory damages in a sum not less than $ 10,000, or more than $ 100,000, as the court considers just.

Whereas the Debtor faced statutory damages of up to $10,000.00 (ten thousand dollars) for his piracy, he faced damages of up to $10,000,000,000.00 (ten billion dollars) for his manufacturing activities. Thus, any role the Debtor's personal piracy played in bringing about the Consent Judgment must have been insignificant because his liability for that conduct was negligible compared to that for his sales of over 100,000 signal theft devices. Under these circumstances, a ruling that the entire Judgment is not dischargeable based on the Debtor's signal piracy would be unreasonable. At the end of the day it makes little difference because the Debtor's piracy, like his sales activities, constitutes a willful and malicious injury to the property of DIRECTV for purposes of 11 U.S.C. § 523(a)(6).

## EQUITABLE LIEN OR CONSTRUCTIVE TRUST ON DEBTOR'S ESOP AND HOMESTEAD

 It is clear that to impose an equitable lien on the Debtor's property, DIRECTV must be entitled to do so under Florida law. The relevant statutes of limitations are provided in Fla. Stat. §§ 222.30(5) (Fraudulent asset conversions), and 95.11(Limitations other than for the recovery of real property).(2006). Pursuant to these Sections, DIRECTV'S action to recover on the alleged equitable liens must have been brought within four

years of the accrual of the claim. *See* Fla. Stat. § 95.031 (2006)("[T]he time within which an action shall be begun under any statute of limitations runs from the time the cause of action accrues." and "A cause of action accrues when the last element constituting the cause of action occurs.").

DIRECTV was aware of the Debtor's activities which form the basis for its claim of equitable lien some time before the District Court lawsuit was filed on July 3, 2001. The present action was commenced on July 18, 2005, four years and two weeks after that date. Therefore the claims for enforcement of an equitable lien or constructive trust against the ESOP and the Debtor's homesteaded residential property are time-barred and will be denied.

■ DIRECTV's claim for an equitable lien against the Debtor's homestead property also must fail because the requirements for reaching such property have not been met. Under Florida law, there are very few situations in which creditors may reach homestead property. The Supreme Court of Florida advised on the limited exceptions to the homestead exemption in the case of *Havoco of America, Ltd. v. Hill,* explaining that: " 'a homestead is *only* subject to forced sale for (1) the payment of taxes and assessments thereon; (2) obligations contracted for the purchase, improvement or repair thereof; or (3) obligations contracted for house, field or other labor performed on the realty.'" 790 So.2d 1018, 1022 (Fla.2001)(quoting *Butterworth v. Caggiano,* 605 So.2d 56 (Fla.1992))(emphasis in original). The Court went on to note that:

[t]he transfer of nonexempt assets into an exempt homestead with the intent to hinder, delay, or defraud creditors is not one of the three exceptions to the homestead exemption provided in article X, section 4. Nor can we reasonably extend our equitable lien jurisprudence to ex-

cept such conduct from the exemption's protection. We have invoked equitable principles to reach beyond the literal language of the excepts only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead.

*Id.* at 1028. Likewise, the Florida Supreme Court has held that the use of illegally obtained funds to purchase or improve a homestead is not sufficient to permit the imposition of an equitable lien against the property. *See Tramel v. Stewart,* 697 So.2d 821 (Fla.1997). Thus, any claim to an equitable lien against the Debtor's homestead property, whether because of a transfer designed to hinder, delay, or defraud creditors, or as the fruits of ill-gotten gain, must fail as a matter of law.

In accordance with the foregoing,

1. Judgment shall be entered in favor of the Plaintiff, DIRECTV, Inc., and against the Debtor, Arthur Joseph Deerey, on Count IA of the First Amended Complaint. Pursuant to 11 U.S.C. Section 523(a)(6) of the Bankruptcy Code, the Consent Judgment entered in the District Court in the amount of $500 million is a nondischargeable Debt owed to DIRECTV, Inc. by the Debtor, Arthur Joseph Deerey.

2. Judgment shall be entered in favor of the Debtor, Arthur Joseph Deerey, and against the Plaintiff, DIRECTV, Inc., on Count IB of the First Amended Complaint based on the determination that the Debt owed to DIRECTV, Inc. by the Debtor, Arthur Joseph Deerey, is not a debt for larceny pursuant to 11 U.S.C. Section 523(a)(4) of the Bankruptcy Code.

3. Judgment shall be entered in favor of the Debtor, Arthur Joseph Deerey, and against the Plaintiff, DIRECTV, Inc., on Count III of the First Amended Complaint for Equitable Lien and/or Constructive

Trust in Regards to the Real Property located at 1401 King Sago Court, Naples, Florida.

4. Judgment shall be entered in favor of the Debtor, Arthur Joseph Deerey, and against the Plaintiff, DIRECTV, Inc., on Count V of the First Amended Complaint for Equitable Lien and/or Constructive Trust in Regards to the Debtor's interest in the ESOP.

A separate Final Judgment shall be entered in accordance with the foregoing.

### FINAL JUDGMENT

This cause came on for consideration on the Court's own Motion for entry of a Final Judgment in the above-captioned adversary proceeding. The Court has examined the record and finds that it has entered its Findings of Fact, Conclusion of Law, and Memorandum Opinion. It is therefore appropriate to enter Final Judgment. Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Plaintiff, DirecTV, Inc., and against the Debtor, Arthur Joseph Deerey, on Count IA of the First Amended Complaint. The Consent Judgment awarding damages of $500,000,000.00 to DirecTV, Inc., to be paid by the Debtor, Arthur Joseph Deerey, is not dischargeable pursuant to 11 U.S.C. § 523(a)(6) of the Bankruptcy Code. It is further

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Debtor, Arthur Joseph Deerey, and against the Plaintiff, DirecTV, Inc., on Count IB of the First Amended Complaint and the same is hereby dismissed with prejudice on the basis that the debt owed to DirecTV is not a debt for Larceny pursuant to 11 U.S.C. § 523(a)(4). It is further

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Debtor, Arthur Joseph Deerey, and against the Plaintiff, DirecTV, Inc., on the Count II of the First Amended Complaint and the same is hereby dismissed with prejudice. It is further

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Debtor, Arthur Joseph Deerey, and against the Plaintiff, DirecTV, Inc., on Count III of the First Amended Complaint and the same is hereby dismissed with prejudice. No constructive trust or equitable lien shall be imposed on the Debtor's Homestead Property located at 1401 King Sago Court, Naples, Florida. It is further

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Debtor, Arthur Joseph Deerey, and against the Plaintiff, DirecTV, Inc., on Count IV of the First Amended Complaint and the same is hereby dismissed with prejudice on the basis that the Plaintiff has no standing to bring a claim for the relief requested. It is further

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Debtor, Arthur Joseph Deerey, and against the Plaintiff, DirecTV, Inc., on Count V of the First Amended Complaint and the same is hereby dismissed with prejudice. No constructive trust or equitable lien shall be imposed on the Debtor's interest in his IRA and the ESOP.

DONE AND ORDERED.